FILED
9/8/20 3:36 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Case No. 17-21385-GLT |
| **CHRISTOPHER ZVOCH**, | Chapter 13 |
| *Debtor.* | |
| **CHRISTOPHER ZVOCH**, | Related to Dkt. Nos. 57, 60, 63 |
| *Movant,* | |
| v. | |
| **RONDA WINNECOUR, CHAPTER 13 TRUSTEE**, | |
| *Respondent.* | |

| | |
|---|---|
| Dennis J. Spyra, Esq. | Ronda Winnecour, Esq. |
| Spyra Law Office | Chapter 13 Trustee |
| Pittsburgh, PA | Pittsburgh, PA |
| *Attorney for the Debtor* | *Attorney for the Respondent* |

## MEMORANDUM OPINION

It may be easier to ask for forgiveness than permission, but there is no guaranty that you will get it. And in the bankruptcy court, there are consequences to having secured neither. Christopher Zvoch (the "Debtor") previously obtained pre-approval of a postpetition vehicle financing transaction, but he secretly replaced that vehicle by entering into a second, more expensive transaction. Having been discovered, the Debtor now moves for approval of this second postpetition financing *nunc pro tunc*.[1]  Ronda Winnecour, the chapter 13 trustee (the

---

[1] *Motion for Approval for Post-Petition Financing, Nunc Pro Tunc* (the "Motion"), Dkt. No. 57.

"Trustee"), opposes the relief, asserting that the purchase was unnecessary, too expensive, and unfeasible.[2] For the reasons set forth below, the *Motion* must be denied.

**I.    BACKGROUND**

The Debtor filed his chapter 13 bankruptcy petition in April 2017. Though he lived in Homestead, Pennsylvania,[3] the Debtor is employed by a health care management services company based in Gaithersburg, Maryland.[4] On the petition date, his schedules reflected that he grossed $5,000 a month, but had substantially negative net income.[5] At the time, the Debtor owned a 2005 Dodge Dakota 4x4 with a monthly debt obligation of $518.[6]

In August 2017, the Debtor moved to incur postpetition financing, explaining that the Dodge was no longer reliable and needed to be replaced.[7] He requested approval of a tentative agreement with Easterns Automotive Group ("Easterns") to finance the purchase of a 2014 Toyota Camry SE or (if it was no longer available), an alternative vehicle with a cost up to $25,000 and requiring monthly payments not to exceed $550.[8] The Court granted the motion but capped the monthly payment obligation at $525.[9] Ultimately, the Debtor financed the purchase of a 2013 Chevrolet Camaro LT R (the "Camaro") for $21,318.49 with monthly payments of

---

[2]    *Trustee's Response to Motion for Approval of Post-Petition Financing, Nunc Pro Tunc* (the "Response"), Dkt. No. 60.

[3]    See *Voluntary Petition for Individuals Filing for Bankruptcy*, Dkt. No. 1 at 2.

[4]    See *Schedule I: Your Income* ("Schedule I"), Dkt. No. 1 at 30; *Amended Schedule I*, Dkt. No. 61-2 at 1. The Debtor has since filed a motion for an amended wage attachment suggesting that he has a new employer, but a further amended Schedule I has not been filed. See Dkt. No. 72.

[5]    *Schedule I*, Dkt. No. 1 at 30-31; *Schedule J: Your Expenses* ("Schedule J"), Dkt. No. 1 at 32-33.

[6]    See *Schedule A/B: Property*, Dkt. No. 1 at 10; *Schedule J*, Dkt. No. 1 at 33. In the year prior to his bankruptcy, two vehicles, a 2013 Ford Fusion and a 2013 Chevy Silverado, were repossessed. *Statement of Financial Affairs for Individuals Filing for Bankruptcy*, Dkt. No. 1 at 37. The Debtor also listed a debt arising from the surrender of a 2010 Camaro. *Schedule E/F: Creditors Who Have Unsecured Claims*, Dkt. No. 1 at 18.

[7]    *Motion to Incur Post-Petition Financing*, Dkt. No. 25 at ¶ 5.

[8]    Id. at ¶¶ 3-4.

[9]    *Order of Court*, Dkt. No. 31.

2

$514.77 through Prestige Financial Services ("Prestige").[10] He then amended his chapter 13 plan to substitute the Camaro payment obligation for the Dodge.[11] The Dodge was eventually surrendered to the lienholder.[12]

Over two years later, the Trustee unexpectedly received notice from Prestige that the account had been paid in full.[13] Soon after, the Trustee moved for a status conference, having learned from Prestige that the Camaro was allegedly traded in for a new vehicle.[14] Since the Debtor had not sought approval for a second vehicle financing, the Court scheduled a status conference to determine the truth of the matter.

At the status conference, the Debtor admitted that he had indeed traded the Camaro in for a 2016 Acura MDX Tech NA (the "Acura") financed by Easterns and had been making monthly payments outside the plan.[15] He also revealed that he had relocated to Texas without informing his attorney or the Court. The Debtor proposed to amend his plan to account for the new obligation, while the Trustee noted that the current plan was in arrears roughly $1,900, representing about two and a half payments. At the end of the status conference, the Court directed the Debtor to file a copy of the settlement sheet from the Acura financing and take whatever corrective action was needed to adequately account for its financing and acquisition.[16]

---

[10]  *Report of Financing*, Dkt. No. 34. The Court notes that both the proposed agreement with Easterns and the financing documentation for the Camaro lists Fort Belvoir, Virginia as the Debtor's address. See *Exhibit*, Dkt. No. 25-1; *Exhibit*, Dkt. No. 34-1.

[11]  See *Amended Chapter 13 Plan Dated October 18, 2017*, Dkt. No. 35; *Order of Court Confirming Plan as Modified*, Dkt. No. 37.

[12]  See *Motion for Relief From the Automatic Stay*, Dkt. No. 41; *Default Order on Motion for Relief From Automatic Stay*, Dkt. No. 46.

[13]  See *Notice of Funds on Reserve*, Dkt. No. 49.

[14]  *Trustee's Motion for Status Conference*, Dkt. No. 50 at ¶¶ 4-6.

[15]  Audio Recording of Hearing Held on February 12, 2020, in Courtroom A, at 10:59-11:00 a.m.

[16]  *Order Requiring Filings*, Dkt. No. 55.

3

In response, the Debtor filed the present *Motion* seeking approval of the transaction *nunc pro tunc*.[17] In support, he asserted that the Camaro proved "insufficient to meet his personal and professional demands" and that he instead needed a "safe, dependable vehicle" that was "better suited to his lifestyle and more appropriate to his employment demands."[18] The attached sales contract disclosed that the Debtor had paid $2,000 cash and financed a balance of $33,674.10, thus requiring a monthly payment in the amount of $719.52.[19] Although the Camaro was ostensibly traded-in as part of the transaction, the $14,400 credit equaled the remaining balance owed to Prestige and did not reduce the Acura's purchase price.[20] The Debtor offered to increase his monthly plan payment by $75 and suggested that neither the estate nor any creditor would be harmed by the financing,[21] presumably because his confirmed plan did not contemplate a dividend to unsecured creditors.[22]

The Trustee opposed the *Motion*, arguing that the Debtor has established no basis for relief.[23] She contends that: there was no emergency requiring the purchase of the Acura; that a suitable replacement could have been found for $25,000 or less; and the monthly payment appears unfeasibly high based on the Debtor's plan default.[24] The Trustee also stated that the plan arrearage had grown to $2,450 since the status conference.[25]

---

[17] *Motion*, Dkt. No. 57.

[18] Id. at ¶¶ 15, 24.

[19] *Exhibit*, Dkt. No. 57-1 at 1-2. It is not entirely clear when this transaction occurred. Although the Debtor avers that it took place in August 2018, the settlement sheet is undated and indicates the first loan payment was due September 24, 2019, suggesting that the sale may have occurred in August 2019. See *Motion*, Dkt. No. 57 at ¶ 17; *Exhibit*, Dkt. No. 57-1 at 1-2.

[20] Id.

[21] *Motion*, Dkt. No. 57 at ¶ 22-23.

[22] See *Amended Chapter 13 Plan Dated October 18, 2017*, Dkt. No. 35.

[23] *Response*, Dkt. No. 60 at ¶ 2.

[24] Id. at ¶¶ 3-5.

[25] Id. at ¶ 4.

4

As directed by the Court,[26] the Debtor then filed amended Schedules I and J,[27] a chapter 13 plan modification,[28] and a supplemental brief regarding the availability of *nunc pro tunc* relief.[29] Astonishingly, his amended schedules revealed that even with the higher Acura payment, his monthly net income more than doubled from -$692 to $779.33.[30] Seizing on this "new" income,[31] the plan modification increased the monthly plan payment from $800 to $1,500 and estimated $19,000 to be available for unsecured creditors.[32]

After a hearing on the *Motion*, the Court took the matter under advisement.

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(D).

## III.    DISCUSSION

A chapter 13 case does not end at plan confirmation, and neither does a debtor's responsibilities. While it is certainly true that confirmation binds both the debtor and creditors to the terms of the plan,[33] the terms of the plan may be revisited at any time before the completion of payments.[34] And just like the debtor, the trustee and unsecured creditors have the right to seek

---

[26] See *Order*, Dkt. No. 58.

[27] *Amended Schedules I and J*, Dkt. No. 61.

[28] *Chapter 13 Plan dated March 12, 2020*, Dkt. No. 62.

[29] *Supplemental Brief Concerning Effect of Recent Supreme Court Case on Debtor's Motion For Approval For Financing, Nunc Pro Tunc*, Dkt. No. 63.

[30] *Amended Schedule I*, Dkt. No. 61-2 at 2; *Amended Schedule J*, Dkt. No. 31-2 at 4.

[31] It is unclear when the Debtor's income increased.

[32] *Chapter 13 Plan dated March 12, 2020*, Dkt. No. 62 at 2, 7.

[33] See 11 U.S.C. § 1327(a); In re Szostek, 886 F.2d 1405, 1406 (3d Cir. 1989).

[34] 11 U.S.C. § 1329(a).

a plan modification.[35] Moreover, in this district, property of the estate does not re-vest in the debtor until the completion of the plan.[36] Thus, all income and property acquired post-confirmation is property of the estate and must be promptly reported to the Court and trustee.[37] Lest there be any confusion, this means a chapter 13 debtor has a "continuing duty to disclose changes in [their] financial situation during the pendency of [their] case."[38] The failure to disclose a material income surge is tantamount to concealing assets and is grounds for dismissal.[39]

Postpetition debt is also a concern.[40] While the Bankruptcy Code[41] grants self-employed chapter 13 debtors the rights and powers of a trustee under sections 363(c) and 364, these attributes are not extended to other chapter 13 debtors.[42] Courts have wrestled with the implications of this exclusion, forming two divergent views. One line of cases considers that, for

---

[35] Id.

[36] See PAWB Local Form 10 at § 7.1 (12/17).

[37] 11 U.S.C. § 1306(a).

[38] See In re Williams, No. 1:10–ap–00474MDF, 2012 WL 3564027, at *15 (Bankr. M.D. Pa. Aug. 17, 2012) (quoting In re Anderson, No. 06–40856–JJR–13, 2009 WL 1065142, at *3 (Bankr. N.D. Ala. 2012); see also Waldron v. Brown (In re Waldron), 536 F.3d 1239, 1244 (11th Cir. 2008) ("[We] recogniz[e] a debtor's continuing duty to disclose changes in [their] financial situation during the pendency of [their] bankruptcy."); U.S. Trustee v. Cortez (In re Cortez), 457 F.3d 448, 457 (5th Cir. 2006) ("In a Chapter 13 proceeding, debtors are obligated to amend their schedules to include subsequent income, even if that income is not known or realized at the time of filing.").

[39] In the Court's experience, chapter 13 debtors have an innate sense of materiality in this context as evidenced by how commonly they report income reductions. The same standard should be applied to the upswings. When in doubt, debtors should err on the side of filing amended schedules if for no other reason than to avoid the appearance of concealing property of the estate.

[40] See, e.g., Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, § 302.1, at ¶ 1 (4th Ed.) (2004) ("Postpetition claims are a complex area of Chapter 13 practice. The Code and Bankruptcy Rules do not manage postpetition claims very well. The result is too much uncertainty for debtors and postpetition claim holders, much complicated strategy serving no obvious good purpose and a growing body of case law that is a testament to the lack of clarity in the Code and Rules.").

[41] Unless expressly stated otherwise, all references to "Bankruptcy Code" or "Code" or to specific sections are to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq*. All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

[42] 11 U.S.C. §§ 1303, 1304.

6

a debtor not "engaged in business," the lack of any express statutory directive to seek pre-approval to incur postpetition debt (whether secured or unsecured) is proof that none is required.[43] The other mandates judicial pre-approval in light of the potential impact of postpetition debt on plan performance.[44]

The issue is conspicuously well-settled in this district: *all chapter 13 debtors must seek prior Court approval before incurring any postpetition financing or borrowing of any kind.* As a practical matter, the fact that property does not re-vest in the debtor upon confirmation precludes a debtor's unilateral diversion of property of the estate from the unsecured creditors to a new postpetition debt. Thus, the requirement of court pre-approval for these transactions is articulated in the district's form chapter 13 plan,[45] its local rules,[46] and this Court's general procedures.[47]

---

[43] See In re Loden, 572 B.R. 211, 215 (Bankr. W.D. Ark. 2017) ("[A] debtor has the ability to obtain post-petition debt without court authorization. However, approval by the trustee would be required if the debtor intended to make payments to the post-petition creditor under [their] plan."); In re Fields, 551 B.R. 424, 428 (Bankr. D. Minn. 2016) ("There is nothing in the Bankruptcy Code that requires court authorization for a debtor in chapter 13 who is not "engaged in business" to incur post-petition debt or to obtain credit."); GMAC v. Bullock (In re Bullock), No. 89-11537, 1990 WL 10007465, at *1 (Bankr. S.D. Ga. 1990) (holding that in the absence of an order of the court to the contrary, debtor may engage in post-confirmation debt transactions without prior approval).

[44] See In re Ripley, No. 14–01265–5–DMW, 2018 WL 735342, at *4 (Bankr. E.D.N.C. Feb. 6, 2018) ("The court cannot approve of transactions with such hazardous financial consequences [to the plan and creditors.]"); In re Ward, 546 B.R. 667, 679 (Bankr. N.D. Tex. 2016) ("notice and court approval are nevertheless necessary whenever significant postpetition debt is incurred by a debtor, *if for no other reason than because of the possible impact on the debtor's plan and the debtor's prospects for rehabilitation*.") (emphasis in original); Cooper v. Rogers Used Cars (In re Cooper), No. 95-0757, 1995 WL 495987, at *2 (Bankr. W.D. Tenn. 1995) ("[T]he debtor has an affirmative obligation to obtain permission of the Chapter 13 Trustee or of the Court prior to incurring post-petition consumer debt."); see also In re Nacci, 586 B.R. 733, 737 (Bankr. N.D. Ohio 2018) (terms of the confirmed plan required court approval of postpetition debt exceeding $500); In re Alomia, No. 17-00561-5-DMW, 2017 WL 3994811, at *1 (Bankr. E.D.N.C. Sept. 8, 2017) (local rules prohibited Chapter 13 debtors from incurring debt of $7,500.00 or more without prior court approval); In re Key, 465 B.R. 709, 713 (Bankr. S.D. Ga. 2012) (requirement to seek pre-approval of postpetition debt set forth by General Order 2010-2).

[45] See PAWB Local Form 10 at § 8.3 (12/17) ("The debtor(s) *must obtain prior court approval* before entering into any postpetition financing or borrowing of any kind . . .") (emphasis added). The Debtor's original plan and his first amended plan used a previous version of Form 10 which did not include this language. Nevertheless, the previous version of the plan form did require all "ongoing payments for vehicles, mortgages and assumed leases [to be] paid through the Trustee, unless the Court orders otherwise." PAWB Local Form 10 at § 6 (07/13).

Of course, the Debtor is not seeking pre-approval of the Acura financing, but relief *nunc pro tunc*. As an initial matter, the Court doubts that this kind of retroactive relief is still cognizable after the United States Supreme Court's ruling in *Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*.[48] In *Acevedo Feliciano*, the Court held that *nunc pro tunc* orders must be strictly limited to "'reflect the reality' of what has already occurred"[49] and cannot be "some Orwellian vehicle for revisionist history—creating 'facts' that never occurred in fact."[50] To that end, a *nunc pro tunc* order "presupposes a decree allowed, or ordered, but not entered, through inadvertence of the court."[51]

In this case, it was the Debtor's failure to seek pre-approval of the Acura financing, not the Court's inadvertence, that prevented entry of such an order. As a result, retroactively approving the Acura financing would not reflect reality, but create a new one where the Debtor complied with all his obligations. These facts are similar to those in *In re Nilhan Developers, LLC*, where the court held that *Acevedo Feliciano* barred *post facto* approval of an

---

[46] See W.PA.LBR 4001-4(d) (defining the requirements of a motion seeking approval of motor vehicle financing).

[47] See W.PA.LBR GLT-Proc(C)(2) (defining the requirements of a proposed form of order to accompanying any motion seeking approval of motor vehicle financing).

[48] Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano, 140 S. Ct. 696 (2020).

[49] Id. at 700-01 (quoting Missouri v. Jenkins, 495 U.S. 33, 49 (1990).

[50] Id. at 701 (quoting United States v. Gillespie, 666 F. Supp. 1137, 1139 (ND Ill. 1987)).

[51] Id. (quoting Cuebas y Arredondo v. Cuebas y Arredondo, 223 U.S. 376, 390 (1912)).

unauthorized loan agreement.[52] In sum, the Court "'cannot make the record what it is not.'"[53] For this reason alone, the *Motion* must be denied.[54]

Even if the *Motion* had been timely raised, the Court would have denied it on the merits. A motion for postpetition vehicle financing may be granted if, when reviewing the facts of the case, the debt is reasonable and necessary for the debtor's successful reorganization.[55] Within the framework of reasonableness and necessity, courts "generally take a fact-intensive review of the case"[56] and consider the impact the additional debt would have on plan performance,[57] on creditors,[58] and on the debtor.[59]

---

[52] In re Nilhan Developers, LLC, No. 15-58443-WLH, 2020 WL 4591662, at 10 (Bankr. N.D. Ga. Aug. 7, 2020) ("Granting nunc pro tunc relief here, to authorize a loan transaction the Court never would have authorized at the time it was entered into, would not reflect the reality of what happened at the time and would essentially create facts by blessing an unorthodox transaction that would have never been sanctioned").

[53] Roman Catholic Archdiocese v. Acevedo Feliciano, 140 S. Ct. at 701 (quoting *Missouri v. Jenkins*, 495 U.S. at 49).

[54] Assuming, *arguendo*, that *Acevedo Feliciano* does not bar retroactive relief in these circumstances, the Debtor has still failed to demonstrate "extraordinary circumstances" under pre-existing Third Circuit precedent. See F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 101 (3d Cir. 1988); In re Arkansas, 798 F.2d 645, 646 (3d Cir.1986).

[55] See In re Nacci, 586 B.R. at 737 ("Reasonableness and necessity are often key components of the determination."); In re Ward, 546 B.R. at 679 ("As for the standard of review [for granting postpetition loans], this court believes it makes sense to use the same type of legal standard that one applies when evaluating borrowing under section 364 of the Bankruptcy Code.").

[56] See, e.g., In re Nacci, 586 B.R. at 737 ("What is the appropriate standard to employ in reviewing a chapter 13 debtor's motion to incur postpetition debt? A review of the case law indicates that courts generally take a fact-intensive review of the case, directed at the terms of the postpetition debt, its purpose, the effect on the plan, and the benefit to the debtor."); see also In re Ward, 546 B.R. at 679 ("Is the borrowing reasonable and necessary? Is it in the best interests of the debtor and the estate? Is there a sound business justification for this? Did the debtor shop and find reasonable market terms? Was this the most favorable option? Is this an exercise of reasonable business judgment? And will this interfere with the confirmed plan?").

[57] See, e.g., In re Alomia, 2017 WL 3994811, at *1 ("While the court commends the Debtor for seeking to further his education and improve his employment and income prospects, the court will not allow the Debtor to incur the proposed debt while he remains delinquent in his Plan."); In re Key, 465 B.R. at 713 ("The General Order states that for approval, the need to incur consumer debt should be 'necessary to the debtor's performance under a chapter 13 plan' … I do not find this debt is necessary for the Debtors' performance of their chapter 13 plan and therefore I deny the motion."); In re Clemons, 358 B.R. 714, 716 (Bankr. W.D. Ky. 2007) ("The purpose behind requiring approval of the Court is to ensure that decisions made by a debtor to obtain credit do not interfere with the debtor's ability to perform under a confirmed chapter 13 plan").

Generally speaking, debtors need to get to work to earn income, making a reliable means of transportation critical to most reorganizations. The Court also recognizes that outside of the large metropolitan areas, public transportation options are limited. Therefore, a motor vehicle loan is typically a reasonable and necessary expense in most cases. That said, debtors are expected to do some "belt-tightening" while in bankruptcy,[60] and they may not force their creditors to shoulder the burden of unreasonable transportation expenses, including the cost of a luxury vehicle when much more economic alternatives exist.[61] Here, the Acura financing is a far more expensive endeavor than what this Court previously approved in this case and what it customarily approves in other chapter 13 cases.[62] Even if the Camaro was ill-suited to the Debtor's needs, he has failed to establish that *this car* at *this price* was the only viable replacement. Personal preference alone cannot justify a luxury price tag when the difference negatively impacts the debtor's creditors.

And contrary to the Debtor's assertions, the Acura financing is harmful to his creditors. The Court would not have approved a monthly payment of approximately $720. As a result, he is effectively seeking to divert net income of over $200 per month from the payment of

---

[58]   See, e.g., In re Nesser, 206 B.R. 357, 371 (Bankr. W.D. Pa. 1997) (denying chapter 13 debtor's motion to incur debt to open a pub where the likelihood of success was too speculative).

[59]   In re Ripley, 2018 WL 735342, at *4 ("The court also should determine whether the contemplated transaction is generally in the Debtors' best interests."); In re Ward, 546 B.R. at 673 ("[T]he incurrence of debt, under the described terms and circumstances, was not in the best interests of the Debtor, not reasonable, and not consistent with sound business judgement."); In re Clemons, 358 B.R. at 716 ("The purpose behind requiring approval of the Court is … to ensure a debtor is not making an imprudent financial decision that could lead the debtor back into bankruptcy.");.

[60]   See In re Duncan, 201 B.R. 889, 901 (Bankr. W. D. Pa. 1996).

[61]   See In re Gibson, 142 B.R. 879, 881 (Bankr. E.D. Mo. 1992) (luxury vehicles are not "reasonably necessary" expenses under section 1325(b)(2)(A)).

[62]   In this Court's view, automotive financing of $25,000 with a monthly payment of $450 is presumptively reasonable given the average vehicle cost, applicable interest rates, and the credit status of most chapter 13 debtors. Nevertheless, motions to incur debt are assessed on a case-by-case basis and an objecting party is free to present facts to rebut that presumption.

his unsecured creditors.[63] The Debtor's plan modification, which suddenly provides $19,000 for the payment of general unsecured claims, is nothing more than a naked attempt to hide that prejudice by re-focusing attention on how much better creditors will do under this plan than the old. But that ignores the fact that the Trustee and unsecured creditors may insist that the Debtor devote *all* current monthly income less "reasonably necessary" expenses for the life of the plan.[64] Put another way, dangling a carrot in front of the general unsecured creditors should not distract them from the fact that their pockets are still being picked.[65]

Finally, while the Court cannot say for certain that the Acura financing is detrimental to his plan performance, the facts are that the plan was in arrears when the Debtor filed the *Motion* and the arrearage grew by the time it was heard. And this is after his income had nearly doubled. The correlation is not encouraging and, at best, suggests that the Acura payment may not be feasible. At worst, this may demonstrate that the Debtor is acting in bad faith.[66] In any event, he has not carried his burden to justify the Acura financing as reasonable and necessary.

## IV.   CONCLUSION

In light of the foregoing, the *Motion* must be denied. As a result, the Debtor may not use property of the estate to pay this unauthorized obligation. This opinion constitutes the

---

[63]  Frankly, the Debtor may have been diverting substantially more income depending on how long it took him to report his wage increase and pursue a plan modification.

[64]  11 U.S.C. § 1325(b)(1), (2).

[65]  It is also important to recognize that any benefit offered by the plan modification is completely illusory until the plan is completed.

[66]  Indicia of bad faith in this case may include: (1) the Debtor's knowing failure to obtain pre-approval of the Acura Financing; (2) the Debtor's decision to enter into a substantially more expensive transaction than was previously approved; (3) the Debtor's failure to voluntarily and promptly amend Schedule I; and (4) the Debtor's continued plan defaults despite his insistence that he has sufficient income.

Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Dated: September 8, 2020

Case administrator to mail to:
Debtor
Office of the Chapter 13 Trustee
Dennis Spyra, Esq.